Gardner *v.* Reidsville.

THOMAS L. GARDNER, a Citizen and Resident Taxpayer of the City of Reidsville, on Behalf of Himself and of Other Citizens, Residents and Taxpayers of Reidsville, Similarly Affected and Situated, v. CITY OF REIDSVILLE, a Municipal Corporation, CLAUDE S. BURTON, CLIFFORD MOORE, and JAMES EVERETTE, Members of the Purported City of Reidsville ABC Board.

(Filed 8 March, 1967.)

**1. Appeal and Error § 19—**

In a trial by the court under agreement of the parties, assignments of error to the court's conclusions of law and its judgment, which assignments are specific and definite and point out the alleged errors relied upon, may be taken as a sufficient compliance with the Rules of Court, even though they are not technically in strict compliance therewith. Rule of Practice in the Supreme Court 19(3).

**2. Elections § 8—**

Every reasonable presumption will be indulged in favor of the validity of an election, including local option elections, and the burden is upon one contesting an election to prove his right to maintain the proceedings and to prove the grounds of his complaint.

**3. Same; Elections § 10—**

An election will not be disturbed for irregularities which are insufficient to alter the result.

**4. Elections § 1—**

The statute under which this local option election was held in a municipality precluded an election therein within three years after a majority of the municipal electors had voted against the proposition. In a county election less than three years prior, the proposition was defeated in the precincts in which residents of the city voted, but several of the precincts embraced territory both within and without the city limits, so that it could not be ascertained whether a majority of the municipal electors had voted for or against the proposition. *Held:* Plaintiffs have failed to carry the burden of showing that the municipal election was precluded. Chapter 650, Session Laws of 1965.

**5. Statutes § 2—**

A statute applicable to a single municipality, without reasonable distinction between such city and other cities or towns for the purpose of classification, is a local act.

**6. Same—**

The word "trade" is used in Article II, § 29 of the State Constitution in association with the words "labor," "mining" and "manufacturing" and under the maxim *noscitur a sociis*, the word "trade" as so used imports a business venture embarked upon by a person or business corporation for gain or profit, and does not embrace an activity conducted by the State itself for the purpose of control in the exercise of the police power.

**7. Same—**

The statute authorizing a vote by municipal electors to determine whether the city should operate liquor stores under the Alcoholic Bev-

erage Control Act is a statute enacted in the exercise of the police power for the control and regulation of intoxicating liquor, and is not a statute regulating "trade" within the purview of Article II, § 29 of the State Constitution.

**8. Constitutional Law § 10—**

Every presumption is in favor of the constitutionality of a statute, and the courts will not pronounce an Act of the General Assembly unconstitutional unless it is plainly so.

PARKER, C.J., concurring.

LAKE, J., dissenting.

SHARP, J., concurs in the dissenting opinion.

APPEAL by plaintiff from *Copeland, S.J.,* May 1966 Regular Civil Session of ROCKINGHAM. Docketed and argued as No. 766 at Fall Term 1966.

Civil action brought under the Declaratory Judgment Act (G.S. 1-253 through 1-267) to have declared invalid and void a referendum election conducted in the City of Reidsville, County of Rockingham, to determine whether liquor stores might be established within the City of Reidsville, and further to have declared unconstitutional Chapter 650 of the 1965 Session Laws of North Carolina: AN ACT TO ALLOW THE CITY COUNCIL AND THE QUALIFIED VOTERS OF THE CITY OF REIDSVILLE TO DETERMINE WHETHER OR NOT ALCOHOLIC BEVERAGE CONTROL STORES SHALL BE ESTABLISHED IN SAID CITY, AND TO PRESCRIBE THE DISPOSITION OF THE NET FUNDS THEREOF.

Chapter 650 of the 1965 Session Laws was ratified on 20 May 1965, to become effective 1 July 1965. The Act is summarized, and in pertinent part quoted, as follows:

Section 1 provides that upon petition of fifteen percent of the qualified voters who voted in the last preceding election for City Council members, the City Council of the City of Reidsville may hold an election on the question of whether or not City Alcoholic Beverage Control Stores may be operated within the City of Reidsville, and that such election shall be conducted pursuant to the same rules and regulations applicable to general elections for the City Council of the City of Reidsville, with the cost of the election to be borne by the general funds of the City.

Section 3 provides for the establishment and maintaining of a City Board of Alcoholic Control in the event the vote is in favor of authorization.

Section 4 provides that the City Board shall have all the powers and duties imposed by G.S. 18-45 on County Boards; shall be subject to the same powers and authority of the State Board as are

County Boards under G.S. 18-39; and the operation of any City Alcoholic Beverage Control Stores shall be subject to and in pursuance of the provisions of Article 3 of Chapter 18 of the General Statutes, except where in conflict with this Act.

Section 5 provides for the disbursement of the net profits derived from operation of Alcoholic Beverage Control Stores within the City of Reidsville.

> "Section 6. In the event the County Commissioners of Rockingham County call an election on the question of whether or not Alcoholic Beverage Control Stores shall be established in the county and before an election is held in the City of Reidsville under the provisions of this Act, and if a majority of the voters in the City of Reidsville who vote in the county election vote against establishing liquor stores in Rockingham County, then no election shall be held under the authority of this Act within 3 years after the date of the county election. . . ."

A county-wide election was conducted in Rockingham County on 27 July 1965, wherein a majority of the voters voted against the establishment of liquor stores in Rockingham County. Five of the thirty precincts within the county lie partially within and partially without the city limits of Reidsville. One of the thirty lies wholly within the city limits. The majority of the aggregate vote of these six precincts was against the establishment of an ABC system, the vote being 1825 to 1786. However, as a result of the manner in which the election was conducted, it was (and is) impossible to determine how a majority of the voters *within the City of Reidsville* cast their vote.

On 23 October 1965 a municipal election was conducted within the City of Reidsville, where only those registered voters who resided within the city limits were allowed to vote. The result of the election was 1,659 in favor of the establishment of liquor stores in the City of Reidsville and 1,628 opposed to liquor stores within the City of Reidsville.

Pursuant to the "Reidsville Act", an Alcoholic Beverage Control Board was subsequently appointed and an Alcoholic Beverage Control system put in operation. Thereafter, plaintiff brought this action, including as defendants the City of Reidsville and the members of the City of Reidsville Alcoholic Beverage Control Board. Trial by jury was waived by consent of the parties, and the case came on for trial on the pleadings, affidavits, and stipulated facts. The trial court rendered judgment in favor of defendants. Plaintiff appeals.

*Everett, Everett & Everett and Allen W. Brown for plaintiff appellant.*

*McMichael & Griffin; Albert J. Post; and Joyner & Howison for defendants, appellees.*

BRANCH, J. Appellees contend that appellant cannot challenge the procedures of the Reidsville election since appellant failed to comply with Rule 19(3) of the Rules of the Supreme Court, 221 N.C. at p. 554. The following is appellant's assignment of error:

> "Plaintiff assigns as error the Court's signing of the Final Judgment which contained erroneous findings of fact and erroneous conclusions of law; and further assigns as error the Court's failure to hold that Chapter 650 violates the terms of Article II, Section 29, of the North Carolina Constitution; and its further failure to hold that even under the specific terms of Chapter 650 irrespective of its constitutionality defendants were not entitled to conduct a municipal liquor referendum; and its failure to hold that the establishment of ABC Stores in the City of Reidsville was unauthorized and in violation of law."

While not in strict compliance with Rule 19(3), plaintiff's assignments of error are specific and definite. Since the Rules of the Court are made for our convenience and in dispatch of our appellate jurisdiction, *Conrad v. Conrad,* 252 N.C. 412, 113 S.E. 2d 912, we will consider appellant's assignment of error as to election procedure.

The question is raised whether Section 6 of Chapter 650, 1965 Session Laws, prevents the holding of a valid election within three years after the county-wide election of 27 July 1965. The pertinent provision of that section is as follows:

> "In the event the County Commissioners of Rockingham County call an election on the question of whether or not Alcoholic Beverage Control Stores shall be established in the county and before an election is held in the City of Reidsville under the provisions of this Act, and if a majority of the voters in the City of Reidsville who vote in the county election vote against establishing liquor stores in Rockingham County, then no election shall be held under the authority of this Act within 3 years after the date of the county election. . . ."

By paragraph 18 of his amended complaint plaintiff alleges:

> "XVIII. That as these plaintiffs are advised, believe and so allege, the defendant City of Reidsville had no right or au-

thority to call and hold a city election on the question of establishment of liquor stores, for that in the countywide election held prior to the city election, a majority of the voters of the City of Reidsville voted against the establishment of liquor stores; that, therefore, the election called and held on October 23, 1965, by the City of Reidsville was null and void."

Defendants by their answer deny these allegations.

Every reasonable presumption will be indulged in favor of the validity of an election. 26 Am. Jur., Elections, § 343, p. 162. This applies as well to a local option election. See 48 C.J.S. Intoxicating Liquors, Contesting Elections, § 87(d), p. 217, where in this regard it is said: "The burden is on one instituting a contest to prove his right to maintain the proceeding and to prove the grounds of his complaint. . . . The usual rules as to the admissibility and the weight and sufficiency of the evidence generally apply to local option election contests."

An election will not be disturbed for irregularities where it is not shown such irregularities are sufficient to alter the result. *Owens v. Chaplin*, 228 N.C. 705, 47 S.E. 2d 12; *Watkins v. Wilson*, 255 N.C. 510, 121 S.E. 2d 861. In the instant case it is stipulated by the parties that, "(I)t is now impossible to ascertain how many of the votes cast in Reidsville Township precincts were cast by persons residing in the City of Reidsville and how many were cast by persons residing outside the City limits."

Plaintiff contends the burden is on defendants to prove that a majority of the votes cast within the City of Reidsville in the county election was not against the establishment of a city Alcoholic Beverage Control system. In support of this contention, plaintiff cites the rule that the burden of proof lies on the person who wishes to support his case by a particular fact which lies more particularly within his knowledge, or of which he is supposed to be cognizant. *Cf. Hosiery Co. v. Express Co.*, 184 N.C. 478, 114 S.E. 823. However, this rule does not apply here, since there is nothing in the record to show that the city election officials or any of the defendants had any control or influence over or access to the officials who held the county-wide election of 27 July 1965. The contrary is inferred since the first election was a *county* election and the election under attack is a *municipal* election.

The prevailing rule is that the burden of proof is on the party holding the affirmative. *Wilson v. Casualty Co.*, 210 N.C. 585, 188 S.E. 102. Although not decisive, we note, in passing, that the only unquestioned vote by the voters in the City of Reidsville resulted in a majority vote "for Alcoholic Beverage Control Stores and Law Enforcement."

Plaintiff depends entirely on the provision of Section 6 of Chapter 650, 1965 Session Laws, and the results of the total votes cast in the six precincts encompassing the City of Reidsville to sustain his allegations. This is not sufficient to meet the burden of proof which he must carry. Furthermore, a careful reading of the section evidences that only where, in the event of a prior election, *it is shown the voters within the City of Reidsville voted against the establishment of ABC stores shall a city election be deferred for three years.* The clear intent of this provision was to prevent a repetitious election where the probable outcome had already been determined. By stipulation it is admitted the probable outcome of a city election could not be determined from the prior county election. We therefore hold that the city election was authorized by the statute.

The principal question presented for decision is whether the Reidsville Act, Chapter 650 of the 1965 Session Laws, is in violation of Article II, Section 29, of the North Carolina Constitution, which provides:

> "§ 29. Limitations upon power of General Assembly to enact private or special legislation. — The General Assembly shall not pass any local, private, or special act or resolution relating to health, sanitation, and the abatement of nuisances; changing the names of cities, towns, and townships; authorizing the laying out, opening, altering, maintaining, or discontinuing of highways, streets, or alleys; relating to ferries or bridges; relating to nonnavigable streams; relating to cemeteries; relating to the pay of jurors; erecting new townships, or changing township lines, or establishing or changing the lines of school districts; remitting fines, penalties, and forfeitures, or refunding moneys legally paid into the public treasury; regulating labor, trade, mining, or manufacturing; extending the time for the assessment or collection of taxes or otherwise relieving any collector of taxes from the due performance of his official duties or his sureties from liability; giving effect to informal wills and deeds; nor shall the General Assembly enact any such local, private or special act by the partial repeal of a general law, but the General Assembly may at any time repeal local, private or special laws enacted by it. Any local, private or special act or resolution passed in violation of the provisions of this section shall be void. The General Assembly shall have power to pass general laws regulating matters set out in this section."

Appellees do not seriously contend that the Act is not local.

In the case of *Surplus Co. v. Pleasants, Sheriff*, 264 N.C. 650, 142 S.E. 2d 697, the Court stated:

"A statute is either 'general' or 'local'; there is no middle ground. . . . Conceivably, a statute may be local if it excludes only one county. On the other hand, it may be general if it includes only one or a few counties. It is a matter of classification. For the purposes of legislating, the General Assembly may and does classify conditions, persons, places and things, and classification does not render a statute 'local' if the classification is reasonable and based on rational difference of situation or condition; ' "universality is immaterial so long as those affected are reasonably different from those excluded and for the purpose of the statute there is a logical basis for treating them in a different manner." ' A law is local, ' "where, by force of an inherent limitation, it arbitrarily separates some places from others upon which, but for such limitation, it would operate, and where it embraces less than the entire class of places to which such legislation would be necessary or appropriate having regard to the purpose for which the legislation was designed, and where classification does not rest on circumstances distinguishing the places included from those excluded." ' On the other hand, a law is general ' "if it applies to and operates uniformly on all the members of any class of persons, places or things requiring legislation peculiar to itself in matters covered by the law." ' . . . Classification must be reasonable and germane to the law. It must be based on a reasonable and tangible distinction and operate the same on all parts of the State under the same conditions and circumstances. Classification must not be discretionary, arbitrary or capricious.' "

Here the statute is applicable in only one city. Neither the statute nor the appellees show any reasonable distinction between the City of Reidsville and any other city or town for the purpose of classification under the terms of the statute. See also *State v. Dixon*, 215 N.C. 161, 1 S.E. 2d 521; *Sams v. Board of Com'rs.*, 217 N.C. 284, 7 S.E. 2d 540; *Coastal Highway v. Turnpike Authority*, 237 N.C. 52, 74 S.E. 2d 310.

Therefore, we conclude that the Act under consideration is a local act. For the purposes of this decision we need not consider whether the Act is special or private.

The more serious question posed for decision is whether the dispensing of intoxicating liquors by the State is a 'trade' within the meaning of the constitutional provision.

"Questions of constitutional construction are in the main governed by the same general principles which control in ascertaining the meaning of all written instruments, 11 A. J. 658, and, 'the fundamental principle of constitutional construction is to give effect to the intent of the framers of the organic law and of the people adopting it,' . . .

"Constitutional provisions should be construed in consonance with the objects and purposes in contemplation at the time of their adoption. To ascertain the intent of those by whom the language was used, we must consider the conditions as they then existed and the purpose sought to be accomplished. Inquiry should be directed to the old law, the mischief, and the remedy. The court should place itself as nearly as possible in the position of the men who framed the instrument. 11 A. J. 675; *Ex parte Bain*, 121 U.S. 1, 30 L. Ed. 849." *Perry v. Stancil*, 237 N.C. 442, 75 S.E. 2d 512.

Article II, Section 29 removed some sixteen or more subjects from the field of local, private and special legislation. Prior to its framing in 1915, more than eighty percent of the laws enacted by the General Assembly were local, special or private laws. Thus it is apparent that the purpose of this amendment, when framed by the legislature in 1915, was to relieve the General Assembly from the necessity of passing on laws relating to certain specified matters in which only a small territory or a few persons were concerned, and to thereby enable members of the General Assembly to devote their time and attention to the enactment of legislation important to the entire State.

The problem of intoxicating liquors was a major problem for the General Assembly of 1915, just as it has been for hundreds of years and is today.

"While the moderate and temperate use of intoxicants, and more especially vinous liquors, is reviewed by what appears to be the greater portion of the populace, not with disfavor, but rather 'as a lawful comfort which God alloweth to all men,' overindulgence has been recognized from remote antiquity, not only as an evil in itself, but also as a cause of crime, cruelty, indolence, neglect, and poverty and, therefore, as a fit subject of moral and legal condemnation. As early as 1552 the British Parliament by statute, restricting the keeping of alehouses and tippling houses, and in America, the problem of liquor traffic has received legislative attention for more than three centuries." 30 Am. Jur., Intoxicating Liquors, § 1, p. 525.

In this state it has long been considered a proper subject of legislative control. *State v. Joyner,* 81 N.C. 534. In connection with the problem, the Court stated in *Guy v. Commissioners,* 122 N.C. 471, 29 S.E. 771: "Nor is it essential that the regulation (of intoxicating liquors) shall be uniform throughout the State." Although we note this statement was made some nineteen years prior to the enactment of the amendment, it evidences early recognition of the fact that due to varying social and cultural differences within the state, the control of intoxicating liquors was not a subject easily susceptible of uniform regulation. The truth of this fact has been subsequently borne out and was recognized by the 1937 legislature when they, after the end of prohibition, adopted a "local option" plan of liquor control. G.S. 18-61. This plan and many local acts have generally been acquiesced in and abided by for thirty years.

Although sixteen specific matters are prohibited by Section 29, Article II, it is noteworthy that the framers of this proposal did not specifically refer to regulation of the sale of intoxicating liquors. It would seem that had it been the intention of the General Assembly to include this ever-present and important question among the prohibited subjects, the term "intoxicating liquor" would have been included in the enumerated list. There are eleven different definitions of the word "trade" in Webster's Third New International Dictionary, varying from "a path traversed or for traverse," to "the business one practices or the work in which one engages regularly." Certainly those who so painstakingly and carefully drafted the proposal for submission to the people would not have chosen a word capable of such varied definitions and meanings as "trade" to include this monstrous and demanding problem.

Because of the singular nature of Section 29, Article II, of the North Carolina Constitution, we find no cases in other jurisdictions actually interpreting the word "trade" in the connection presented by this appeal. However, in the case of *Cohen v. State,* 53 Tex. Cr. R. 422, 110 S.W. 66, defendant was indicted under a statute providing for the punishment of anyone engaged in the "business or occupation" of keeping or storing intoxicants for others in any county, etc., where the sale of intoxicants had been prohibited, who permitted another to drink intoxicants within such place of business. Defendant claimed that the intoxicants drunk on the premises were not kept for hire or profit, nor as a business or calling, but that such keeping was casual and incidental. The court held that an instruction defining "business or occupation" to be "that which engages one's time and attention or labor, or that about which one is engaged or employed," was misleading and that the correct defi-

nition of the words "business and occupation" is meant "a calling, trade, or vocation which one engages in for the purpose of making a living or of obtaining wealth."

The case of *State v. University Club,* 35 Nev. 475, 130 P 468, is one which considered whether a statute imposing a license tax on persons engaged in the "business of selling liquor" applied to a bona fide social club where liquor was sold for a fixed charge, and profit went to the general expenses of the organization. The court held that the term "business" as used in the law imposing the license tax on business, professions and callings ordinarily means "a business in the trade or commercial sense; one carried on with a view to profit or livelihood."

In the case of *City of St. Louis v. Smith,* 325 Mo. 471, 30 S.W. 2d 729, the court held that a municipality was not an "incorporated company" within the constitutional provision providing for the right of trial by jury in a condemnation proceeding. The distinguishing difference between a municipal corporation and a business corporation was made in that the latter is one organized for the purpose of carrying on a *business for profit,* while the former is organized with political and legislative powers for the purpose of local civic government and police regulation of the people of a particular district included within its boundaries, and is a subordinate branch of the government of a state.

Our own Court has considered the prohibitions contained in Section 29, Article II, of the North Carolina Constitution in other connections, but has never directly passed on the question of whether the operation of an alcoholic beverage control store by the State or a municipality is a trade. However, in the case of *State v. Chestnutt,* 241 N.C. 401, 85 S.E. 2d 297, defendant appealed from conviction under an act which banned all motor vehicle races on Sunday in Wake County. Defendant contended the act violated Article II, Section 29 of the North Carolina Constitution. The Court held the statute constitutional, stating through Bobbitt, J.:

"Conceding, *arguendo,* that the statute, directly affecting conduct in a single county, is a local act, *S. v. Dixon,* 215 N.C. 161, 1 S.E. 2d 521, is it an act *regulating labor or trade* within the meaning of Art. II, sec. 29? Were the statute directed solely against labor, *e. g.,* compensated employment, or trade, *e. g., business ventures, for profit,* in relation to the conduct of motor vehicle races on Sunday in Wake County, the question posed would be serious indeed. But where the statute in sweeping terms bans an activity, to-wit, all motor vehicle races on Sunday in Wake County, making it a misdemeanor to promote

or engage in the proscribed activity, without regard to the *commercial or non-commercial character of the activity*, the fact that there defendants promote and engage in such activity *for profit and for compensation* puts them in no better position than those who promote and engage in such activity without reference to profit or compensation." (Emphasis ours)

On the other hand, the Court, in the case of *Speedway, Inc. v. Clayton,* 247 N.C. 528, 101 S.E. 2d 406, interpreting a statute which regulated professional racing in Orange County, held the statute invalid as being a local act regulating trade, prohibited by Article II, Section 29, North Carolina Constitution. The Court so held on the basis that this was an act aimed at *persons, firms or corporations* promoting and conducting motorcycle or motor vehicle races *for profit* in Orange County.

The results reached in *Clayton* and *Chestnutt* are distinguishable in that they recognized the difference in an absolute prohibition under the State's police power and a regulation of a *business venture* entered into for profit by persons, firms or corporations. Both *Chestnutt* and *Clayton* differ from the instant case in that here there is a *State agency* as opposed to persons, firms or corporations, and here the defendants are engaged in a governmental operation as opposed to pleasure or a business venture for profit.

"The will of the people as expressed in the Constitution is the supreme law of the land. . . . In searching for this will or intent, all cognate provisions are to be brought into view in their entirety and so interpreted as to effectuate the manifest purposes of the instrument. . . . The best way to ascertain the meaning of a word or sentence in the Constitution is to read it contextually and to compare it with other words and sentences with which it stands connected. *Noscitur a sociis* is a rule of construction applicable to all written instruments." *State v. Emery,* 224 N.C. 581, 31 S.E. 2d 858. "The maxim is, *noscitur a sociis:* the meaning of a doubtful word may be ascertained by reference to the meaning of words with which it is associated." *Morecock v. Hood,* 202 N.C. 321, 162 S.E. 730.

The framers of the Constitution have enumerated a great many specific subjects, then grouped the words "regulating labor, trade, mining, or manufacturing." Applying the rule of *noscitur a sociis* to the word "trade," in reference to the words with which it is associated, we are led to the conclusion that "trade" refers to a business venture embarked in for gain or profit by a person or a business corporation. It refers to commerce engaged in by citizens of

the State, and not a restricted activity conducted by the State itself.

As one of his principal authorities, appellant cites and relies on *Taylor v. Carolina Racing Association,* 241 N.C. 80, 84 S.E. 2d 390, where an act providing for the operation of a dog-racing track in Morehead City was held unconstitutional by the Court as being a local and special act regulating trade. Under provisions of the act the track was to be operated by a corporate licensee of a city racing commission. It is noted there were other reasons for declaring the act invalid in the *Taylor* case, in that Article II, Section 7, was violated because there was a grant of privilege and immunity, and further, there was an unlawful delegation of legislative power. This was also a case where a private corporation was unquestionably embarked on a business venture for the purpose of profit. In deciding the case, pertinent principles as to the sovereign police power were clearly and concisely stated by the Court, speaking through Bobbitt, J., as follows:

"Legislative power vests exclusively in the general assembly, Constitution of North Carolina, Article II, and except as authorized by the Constitution, as in case of municipal corporations, may not be delegated. . . . (A)n act, otherwise valid, may be enacted so as to take effect upon approval by a majority of the qualified voters of the affected locality, . . .

" 'The power of the legislature to enact laws conferring police powers and regulating traffic, etc., within particular localities, seems to be well settled.' . . .

"Legislation enacted in the exercise of the police power for the benefit of the public is as extensive as may be required *for the protection* of the public health, safety, morals and general welfare of the people."

Again considering the exercise of the sovereign police power, the Court, speaking through Parker, J. (now C.J.) in the case of *Boyd v. Allen,* 246 N.C. 150, 97 S.E. 2d 864, said: "Under its inherent police power the State of North Carolina has the right to prohibit, regulate or restrain the use, manufacture and sale of beer within its bounds. . . . The liquor business 'stands, by universal consent, in a class peculiarly within the police power.' " This police power allows the State of North Carolina to prohibit, restrain or *regulate* the sale of intoxicating liquor within particular localities upon approval by a majority of the qualified voters of the affected locality. If there exists in the sovereign, under the exercise of its police power, the right to regulate intoxicating beverages, it logically follows that

the sale or dispensing of intoxicating beverages must either be permitted by the sovereign state or be sold or dispensed by the sovereign state. As stated by Stacy, C.J., in *Amick v. Lancaster,* 228 N.C. 157, 14 S.E. 2d 733: "It would be strange indeed, if the same government which authorizes the establishment of a 'liquor control store,' should also provide for its padlocking at the instance of a private citizen. . . ."

It is noted that profits were contemplated under the statute. However, these profits, if any, would be distributed primarily to governmental agencies and for law enforcement.

The Act under consideration made any board authorized thereunder subject to the provisions of Article III, Ch. 18, of the General Statutes, commonly known as the ABC Act of 1937. The first section of the Article, *i. e.,* G.S. 18-36, provides in part: "The purpose and intent of this article is to establish a system of *control* of the sale of certain alcoholic beverages in North Carolina." (Emphasis ours) G.S. 18-39 provides: "Powers and authority of Board. — Said state board of alcoholic control shall have power and authority as follows, to wit: (1) To see that all the laws relating to the sale and *control* of alcoholic beverages are observed and performed." (Emphasis ours). G.S. 18-46 provides in part:

> "No alcoholic beverage shall be sold knowingly to any minor, or to any person who has been convicted of public drunkeness or of driving any motor vehicle while under the influence of intoxicating liquors, or has been convicted of any crime wherein the court or judge shall find as a fact that such person committed said crime or aided and abetted in the commission thereof as a result of the influence of intoxicating liquors (within one year of any such conviction), or to any person known to be an habitual drunkard or who has within one year been confined in the inebriate ward of any State institution. The manager and the employees of and in any county store may, in their discretion, refuse to sell alcoholic beverages to any individual applicant, . . . .
>
> "It shall be unlawful for any person to buy any alcoholic beverage if he be within the class prohibited from purchasing same as set out in this section, and it shall further be unlawful for any person to buy any alcoholic beverage for any person who may be prohibited from purchasing for himself under any of the provisions of this article."

G.S. 18-53 prohibits advertising by any county ABC store and on billboards, signs, or other device.

G.S. 18-54 prohibits advertising of alcoholic beverages by any radio broadcast.

G.S. 18-58 regulates the transportation of alcoholic beverages.

These statutory acts and pronouncements of intention by the legislature lead us to the conclusion that the purpose of the alcoholic beverage control act of 1937 and the many local acts of regulation and prohibition were to *control* every possible facet of intoxicating liquor.

Considering our Court's definition of the word "trade", *i. e.,* a "business venture for profit," *Speedway v. Clayton, supra,* in connection with the recognition that it has never been the philosophy of the people of North Carolina or their elected representatives to put the State in competition with private enterprise, we conclude that it would necessitate cynical, strained and illogical reasoning to hold that it was the intent of the legislature in passing the 1937 Act or of the 1965 legislature in passing the "Reidsville Act" to place the sovereign state in a "business venture for profit" for the purpose of dispensing a product to its people which is recognized as a cause of crime, cruelty, indolence, neglect and poverty.

We cannot conceive that the people of North Carolina, speaking through their representatives, contemplated under Section 29 of Article II that the sovereign state would enter any trade or business venture for profit. Nor did they intend to limit or fetter the police power of the State in any manner in its control of intoxicating liquor. Rather, we conclude that it is evident the people of North Carolina recognize that decreeing total abstinence from intoxicating liquor is futile, and that in localities where a majority of the qualified voters approve, the State may undertake the controlled dispensation of alcoholic beverages in the exercise of its police power. "Undoubtedly, the State possesses the police power in its capacity as a sovereign, and in the exercise thereof, the Legislature may enact laws, within constitutional limits, to protect or promote the health, morals, order, safety, and general welfare of society." *State v. Ballance,* 229 N.C. 764, 51 S.E. 2d 731.

This Court recognizes a presumption in favor of the constitutionality of a statute. In the case of *McIntyre v. Clarkson,* 254 N.C. 510, 119 S.E. 2d 888, the Court said: " 'It is well settled in this State that the Courts have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconstitutional — but it must be plainly and clearly the case. If there is any reasonable doubt, it will be resolved in favor of the lawful exercise of their powers by the representatives of the people.' "

"Every presumption is in favor of the constitutionality of a

statute, and the courts will not pronounce an act of the General Assembly unconstitutional unless it is plainly so." Strong, N. C. Index, Vol. 1 (Supp.) Constitutional Law, § 10.

And again considering the constitutional question in the case of *Assurance Co. v. Gold*, 249 N.C. 461, 106 S.E. 2d 875, the Court stated: "Every presumption favors the validity of a statute. It will not be declared invalid unless its unconstitutionality be determined beyond reasonable doubt." See also 16 C.J.S., Constitutional Law, § 99(b).

Thus applying these recognized rules of construction, we hold that Chapter 650 of the 1965 Session Laws does not violate Article II, Section 29 of the North Carolina Constitution, as the act of dispensing intoxicating liquors by the State is not a trade, but is a valid exercise of its police powers. Nor does this exercise of the police power violate the terms of Article II, Section 29 of the North Carolina Constitution as being a partial repeal of a general law.

Affirmed.

PARKER, C.J., concurring in the majority opinion.

". . . (T)he liquor traffic is admittedly dangerous to public health, safety, and morals, and is therefore essentially within, and its regulation or prohibition is fully justified under, the police power. . . ." 30 Am. Jur., Intoxicating Liquors, § 23.

"Publicly owned liquor establishments are governmental agencies, established in the exercise of the police power, to accomplish governmental purposes, and to perform a governmental function." 30 Am. Jur., Intoxicating Liquors, § 204.

"In some earlier cases, it was argued in support of the contention of the unconstitutionality of laws providing for the sale of liquor through state liquor stores or dispensaries, and prohibiting sales by any other persons, that traffic in intoxicating liquors was a private pursuit in which the government, whose undertaking must be confined to those of a public character, could not engage in. Such reasoning, however, never attained general acceptance; the prevailing view is that these laws do not violate the inalienable rights of citizens, are not class legislation, and do not infringe upon the due process clause or any other provision of the Federal Constitution, but are a valid exercise of the police power in controlling the liquor traffic; and are police enactments, and thus within the meaning of the Wilson Act." 30 Am. Jur., Intoxicating Liquors, § 205. See also *Ziffrin v. Reeves*, 308 U.S. 132, 84 L. Ed. 128.

In *Boyd v. Allen*, 246 N.C. 150, 97 S.E. 2d 864, the Court said, "The liquor business, 'stands by universal consent, in a class peculiarly within the police power.'"

In my opinion, there is nothing in the law or statutes of this State permitting the sale of intoxicating liquor in State ABC stores to support the theory that the State of North Carolina or any of its counties or municipalities operating ABC stores is engaged in a trade or business within the purview of the word "trade" as used in Article II, section 29 of the North Carolina Constitution. The rationale behind the statutes of this State permitting, controlling, and regulating the sale of intoxicating liquors by publicly owned ABC stores is that such ABC stores are governmental agencies, established in the exercise of the police power of the sovereign State of North Carolina to accomplish governmental purposes and to perform a governmental function under the inherent police power of the State. The systematic purchase and resale of a commodity for profit by private individuals, or an association of private individuals, or a private corporation, is primarily to make a private gain or profit. In my opinion, that is trade in the connotation of the word "trade" as used in Article II, section 29 of the State Constitution. Any gain or profit made by any ABC store of this State operating under our State statutes is not a private gain or profit, but is a gain or profit for the public and not any individual. The North Carolina Department of Motor Vehicles through its Commissioner is charged with the responsibility of administering the laws regulating the operation of motor vehicles in the State of North Carolina. G.S. 20-39. Receipts from the sale of registration plates for motor vehicles by the Department of Motor Vehicles during the fiscal year ended 30 June 1966 exceeded the cost of these registration plates by more than forty-two and one-half million dollars, according to figures furnished from the accounting records of the Department of Motor Vehicles by the Director of the Division of Accounts. Can it be successfully maintained that by reason of this, the Department of Motor Vehicles is engaged in trade or business? In my opinion, the answer is, No. In my opinion, the provision of Article II, section 29 of the North Carolina Constitution inhibiting the General Assembly to enact any private or special legislation or any local, private, or special act or resolution relating to trade connotes a trade engaged in by a person, or group of persons, or a private corporation for private gain or profit, and the local act challenged by plaintiff in the instant case is not in conflict with this provision of our State Constitution.

I concur in the majority opinion.

LAKE, J., dissenting.  The systematic purchase and resale of a commodity for profit is trade. This is true even though the one engaged in such course of action be a municipal corporation or an agency thereof. It is true even though the commodity purchased and resold be an alcoholic beverage. A law which provides that one person can engage in a trade within a certain locality and no one else can do so is a regulation of that trade. It is nonetheless a regulation because its primary purpose is to protect the public morals. Article II, § 29, of the Constitution of North Carolina provides, "The General Assembly shall not pass any local, private, or special act or resolution * * * regulating * * * trade * * *." The Act under which the defendants propose to establish and operate liquor stores within the city of Reidsville is a special or local act. Consequently, it is unconstitutional and the establishment and operation of such stores within the city is not authorized thereby.

It is no answer to say that this Act is an exercise of the police power. Of course it is. So is every valid regulation of trade. It is nonetheless a regulation of trade. This exercise of the police power in regulation of trade is unconstitutional because it is done by a local act, which Article II, § 29, of the Constitution forbids the General Assembly to do.

The majority of the Court say they "cannot conceive that the people of North Carolina, speaking through their representatives, contemplated under § 29 of Article II that the sovereign state would enter any trade or business venture for profit." I am sure this correctly represents the political philosophy of the people and their legislators when this provision was put into the Constitution. The implication, however, that the statutes authorizing the sale of alcoholic beverages in county and municipally operated stores do not put these governmental units into a "trade or business venture for profit" attributes to the members of the General Assembly a degree of naivety which I believe is unwarranted in view of their demonstrated awareness of conditions in North Carolina and their astute judgment with reference to fiscal matters. The State Alcoholic Beverage Control Board publishes an annual report of "Public Revenues From Alcoholic Beverages — North Carolina ABC Boards," unit by unit. The report for the fiscal year July 1, 1965 to June 30, 1966 shows Gross Sales $118,304,628.51; Net Revenue (to the counties and municipalities operating stores) $14,979,597.67; State Tax (in addition to the Net Revenue to counties and municipalities) $12,404,408.60. In other words, the State and local governments combined derived from the sales of these beverages in those 12 months a total profit of $27,384,006.27, which is over 23% of the gross sales. The share designated for "Education" was $316,683.76;

that for "Law Enforcement" was $1,187,085.26; and that for "Rehabilitation Contribution" $1,990,671.28. These figures leave one with some reasonable basis for concluding that the profit motive is not wholly divorced from the sale of alcoholic beverages by these governmental agencies.

I am authorized to say that SHARP, J., joins in this dissenting opinion.